Good morning, Your Honors. My name is Ethan Brescher. I represent Hildene, and we respectfully request that the Court reverse the order of summary judgment and reinstate the claim for trial. What happened here was a sleight of hand. The banister, the bank holding company here borrowed $20 million. And in 2012, Arvest Bank came in, decided to take over the branches that Union Bank had built, and Banister is the holding company for Union Bank. And there was a big problem standing in the way, which was the obligation to repay the $20 million under the various indentures. And in particular, there was the Let me go back a few months before 2012, when the FDIC apparently assessed a $120 million cross lien against Union Bank assets with priority over creditors, according to the closing counsel's brief. So what priority did that cross lien have with respect to these debenture holders? Well, just so it is clear, the cross lien was imposed because a sister bank had failed. So the FDIC said the lien applied against Union Bank. The FDIC is able to waive that. It chose to waive it in this particular instance as part of the transaction. Yes, but when filed, what was the priority? Is it an IRS super lien type? What is the priority? I know the nature of the lien was never litigated. It is not in the record of what Yes, but is there a law on this? Is there a law on FDIC liens? Are they like the IRS? You know, some of the IRSs are head of everything that has ever been invented. Respectfully, I don't know the answer to that, Your Honor. I do know I could take a look at that and provide supplemental authority if that is important. It wasn't important in the district court. Except that without the FDIC waiver, the ventures were worthless, perhaps, as a result of the cross lien. That is what cost my money. Mine too, by the way. We know what the FDIC and the Federal Reserve are doing. They are protecting depositors and, to a lesser extent, employees. The venture holders are going to be last in line with those regulators after a crisis like we had in 2008. The FDIC chose to waive that after the deal. They waived it with the understanding that the depositors were going to be made whole and the employees were probably going to keep a job and the ventures haven't been assumed. With all respect, that is not a defense to the tortious interference claim that was asserted. It wasn't asserted that that affects the damages, right? That was never addressed. The issue of damages is the ARVAS thought that there was money available because they required Bannister to provide an indemnity for the claim at issue. They obviously thought that there was something there. ARVAS wouldn't have made that a prerequisite of the transaction that the holding company indemnified against any losses on the tortious interference claim. That was after their sabers were rattled. Before the sabers were rattled, they were talking about the trucks bringing a claim and then after they signed the initial purchase agreement, there was notice that the trucks holders thought that they had a claim and then they required it as part of it. But there was obviously something there from their perspective to come to that this was a satisfiable debt that they could get something out of Bannister. That was not part of what the decision in the district court was on the issue of damages on the tortious interference claim. The district court never addressed that. Counsel, the other thing, so you know your time is short, big, big issue. Does this simply boil down to how company was defined in the basic agreement? Your Honor, I don't agree with that. I think that the issue under the boilerplate nature of the clause here and the way that the Sharon Steele case and the Bank Atlantic cases, you have to analyze and the district court did not do this. You have to analyze the clause for what its purpose is, which is to make sure that there is an ability of the holder of the debt to recover what was loaned, meaning that there are some assets that it's going to be able to repay. And that the nature of that clause, the purpose of the clause If these debentures are hopelessly underwater, it seems to me the nature of the practical inquiry is different. Well, that's The purpose is fine when the agreement was drafted when times were good, as it was. And now times are bad and the government regulators are saying we need a white knight to save the depositors and hopefully the employees. Well, I mean, Bannister itself could have filed. Somebody is going to lose. Well, that was never adjudicated at all in the district court and wasn't part of the basis that the claim was dismissed. You place so much stress on the lie to the Arkansas regulators. And this is the reason why I don't find that argument very persuasive. Well, we don't even think we need to get to that. I mean, I don't even have to look very hard as to whether it was a lie, a misstatement or simply a discussion of realities. Under Missouri law, which we think applies, we don't have to show that they had bad conduct. As long as there was a tortious, as long as there was an interference with an existing contract, improper motive is not a requirement. And recently, the Missouri Court of Appeals reiterated that in the rail switching services case from November 7, 2017. We did not have to establish, we do not have to establish on a tortious interference claim any sort of improper motive here. And so that's one of the arguments. And even if we did. You argued that. Well, we did. We argued that if it's nonetheless, that we nonetheless have improper motive. It's a lot more complicated than that under tortious interference law as I've studied it. And I think in Missouri. Well, the rail switching case reiterated the law and clearly drew a distinction and said where there's an existing contract, where the defendant doesn't have a pre-existing interest in that contract, improper motives need not be established. So this is an add-on for us, the misrepresentation. The action has to be without justification. Well, there was no justification for them to interfere with the obligation to repay the loan. That's your little, tiny, squinty-eyed view of what was going on. But that's not reality. They wanted to do a deal that the regulators desperately wanted them to do. And they had a business reason. They wanted to establish branches in Missouri. Well, they wanted to do that. They had to repay the debt. But not just to say, oh, yeah, and we'll pay off that $25 million, too. Well, that was real money that was borrowed that they decided they didn't want to pay back. They wanted the benefit. It wasn't borrowed from Arvest. Arvest borrowed from the lenders here who were suing to recover the money that was loaned. Isn't it true that Arvest, all they did was say, we're willing to make this deal, but we aren't buying that? And they were, listen, they went out, they solicited 50 different banking corporations and said, will you join our dance? One person was interested. One person said, yeah, we'll do that, but we're not buying that piece of it. And they would have walked away. And in a liquidation, would these creditors with the FDIC $100 million cross-collateralized position with the lien, how would your guys ever get paid? It was a take-nothing deal to begin with. Well, we don't know. If they, for example, they could have filed for bankruptcy, they could have been in auction, they could have gotten more money than the $1 that was offered here. Does the record say how many, what cents on the dollar was paid by these collateral obligation holders that you're representing? How much of the? How much of the? What did you pay for the $25 million claim? I don't know. Is it in the record? I don't want to know. No, it's not in the record. But I would say at that point, the Second Circuit in the NML case dealt with this very issue with the Argentinian debt, where there was a claim that there was a hedge fund that had bought the debt at a deep discount. And Argentina came in and said, well, these are vultures who came in and bought our debt at a deep discount. And the Second Circuit said, that's not a relevant factor when you're looking at the loan obligation, where they bought the debt at is irrelevant. What we have here is a situation where we have a boilerplate clause that applies nationwide, as the Sharon Steele case, as the Bank Atlantic case, as the commentaries say, these have to be applied uniformly. And what has happened here, what the district court ignored entirely, was the purpose of the clause. And what it allowed for a situation where they walked through by a sleight of hand the gigantic door saying, we won't take the stock. We'll leave the stock of an empty shell with nothing in it. We'll scoop everything out of it. You have a worthless piece of paper. And they take it out. And oh, guess what? We don't. They didn't do business. It wasn't a transaction with Bannister. Sorry? It wasn't a transaction with Bannister. It was a transaction with Bannister's subsidiary. Right. But Bannister was one of the signatories on the document. They represented that it didn't violate the successor of the word clause. And then the amendment, they required Bannister to indemnify them. Am I right to infer from your argument, which I had already thought was true, that if there was no breach of Article 11, the statute of limitations issues don't matter? Right. I mean, if there's a conclusion that the indenture wasn't breached and the other issues, I mean, there's no tortious interference claim and there's no statute of limitations issue to address. The main issue is whether the indenture itself, the successor of the word clause, was breached here. And then the other issues become pertinent. I had to ask that because the brief led off with how many pages all about statute of limitations. Well, that was the basis of it. Until we get to the end of that, we haven't reached what matters. Well, the district court, you know, it's hard to know. The district judge addressed it on a statute of limitations ground and then addressed the breach of the indenture as dicta. I mean, I'm not clear, you know, entirely what, if that's an issue that's actually decided or it's just dicta from the district court on the indenture. Well, because the district judge said the claim was barred by the statute of limitations. So, therefore, that was the basis of which some of your judgment. Well, having sat there for 25 years as a district judge, either as a state or federal district court judge, I'll tell you that when you decide something on the statute of limitations and you can say that we're also going to lose on the merits, then you address the merits because if the thing comes kicking back to you, you're not having to go back and do that again. Well, I mean, our view is that the law is clear that the purpose of the indenture is to protect the, of the clause was to protect the lenders. And what they did was a trick. And they just created as an asset. The question is whether it's a legal trick, right? And whether it's a legal trick. And the way you can answer that question is you look at what the purpose of the clause is. The purpose of the clause is to make sure that there's assets to recover the loan. Do you get to the purpose if the plain language says something differently? I think that the case law says that you look at the, well, the language itself isn't even clear. It talks about property with a lowercase p. It doesn't define it. And you have to look at what the purpose was of what this was in the first place. And the property campaign will leave you with a sheet of paper that's worth a penny. Not that uncommon in the cases we see. But the trickster here is not the defendant. The trickster vis-a-vis the borrowers is Bannister. But that's an empty pocket. And Arbus came in and they realized there was. . . Yeah, Arbus said we'll only deal with you if we don't have to assume. . . But they caused the breach. That's the tortious interference. They caused Bannister to breach the indenture. They interfered with that relationship. Every time you enter into a contract with another party that results in a breach of that party's contract with a third party, you've tortiously interfered? I think in this case they did. They caused the breach. That's just not the law. And they lied to the regulators in Arkansas. What was the purpose of telling them that they talked to the Trump's trustee? The district judge said, yeah, it looked like they were trying to tell the Arkansas regulators that the Trump's trustee had blessed the deal. They would lie to them. That was just . . . that was to get it . . . to slide it through and get regulatory approval because the regulators were asking them during that meeting about this very issue. And so they said, oh, we talked to them. And everything . . . and they left. Remember they were doing a deal the regulators were desperate to have them do. Well, the Arkansas . . . that was the . . . the Arkansas regulators didn't regulate Bannister. They were the ones . . . they needed approval from the Arkansas regulators here. But it wasn't the ones who were regulating Union Bank. That was the regulators in Missouri. So they go to Arkansas and they say, oh, we talked to the Trump's trustee. They lied to them. There was a purpose to lying. The district court . . . and as the court earlier . . . arguments on summary judgment addressed the standards on summary judgment. What was the purpose of the lie? A jury should decide why they lied there. They knew. These were experienced lawyers for a very large bank who went into the regulators and misrepresented a fact. That is pertinent and material evidence that should be presented to a jury. And my time is . . . I have 24 seconds for rebuttal. So . . . anyhow, thank you, Your Honors. Thank you. Mr. McGrane. Good morning and may it please the court. Sean McGrane from Squire Patent Bogs for the defendant and appellee, Arvest Bank. One note, Your Honors. Bannister Banksters is represented here today by John Power from Hush Blackwell. Because the only issue touched upon in Bannister's brief is the question of whether or not the obligor provision was breached, we share that argument and so Arvest Bank will be taking all 15 minutes allocated for the appellees. One note, there are specific provisions of federal law that discuss and prescribe the applicability, enforceability, and priority of FDIC cross lanes. I do not have those provisions with me, but I can point the court to docket entries number 181 and 193 in the district court where Arvest Bank identifies those statutory provisions. The FDIC cross lane was superior to these troughs. That is unquestioned. The FDIC made clear to all of the parties at a meeting here in Kansas City in October of 2011 that its lane was priority to the troughs. And so there's no question about that issue. And again, that's governed by federal law specific provisions. And to point one thing out, Arvest Bank moved for summary judgment on six separate and independent bases. Maybe we got a little greedy. We won on three. They were not dicta. Each of these three issues is a separate and independent bases. We lost on two, but there was a sixth issue. Whether or not Hildyne was damaged, we did argue that issue in the district court. The district court, that's the only issue the district court did not rule on. It is within this court's power to affirm on that basis if it would like. But just on that score, Judge Loken, your phrase, hopelessly underwater, perfectly captures the situation here. In 2009, three years before this deal closed, a year and a half before Arvest Bank was even in the picture, in 2009, the FDIC issued a cease and desist order that prevented Union Bank from issuing any dividends upstream to its parent company, Bannister. In 2010, the Federal Reserve Bank issued an order to Bannister telling them they could no longer make payments on the troughs. Of course, by that point, Bannister had already stopped making payments on the troughs. They stopped making payments on the troughs in 2009. So these securities were hopelessly underwater, and that's not in dispute. Hildyne's own analyst in charge of reviewing Midwestern banks said the bank would not have made it another quarter. The Federal Reserve Bank at Kansas City said this bank was not going to survive. The FDIC said it. Hildyne's expert has said it, that absent some transaction, this bank was not going to make it out of 2012. And so while there are many, many legal issues that are interesting in this case, ultimately, it is a bit of an academic exercise because Hildyne was not going to get paid anyway. If it's all this clear, why didn't the district court rule on that? I don't know, Your Honor. I don't know. You didn't ask for reconsideration. We did not ask for reconsideration. Okay, go ahead. He didn't deny it? He just didn't reach it? He did not reach the issue of whether or not Hildyne or its asset nor U.S. Bank was damaged. So that issue, if, God forbid, we end up back in the district court, that issue is still to be litigated there, although, again, this court can't affirm on that basis. But the point is, neither Hildyne nor U.S. Bank was ever going to get paid, and that was going to happen long before Arvest Bank got involved. Now, Judge Benton, your question was also exactly right. Ultimately, this first basis for summary judgment, whether or not there was a breach of the successor obligor provision, which is the fundamental question here. It is the most important, most basic, and we think most straightforward question. Ultimately, it does come down to the question of how do we define the term company. Fortunately, the indenture makes that very easy because company is a defined term in the indenture. The indenture defines company in Article II to be Bannister Bank shares and only Bannister Bank shares. That definition does not include Bannister subsidiaries, one of which was Union Bank. Also, the indenture separately defines subsidiaries. So to resolve any doubt about how crystal clear the definition of company is, the indenture also separately defined subsidiaries. And so there is no doubt, there is no ambiguity that the word company in the indenture means Bannister and only Bannister. And to underscore the point, as the district court noted in its opinion, in the indenture, separate and apart from these separate definitions, there are multiple provisions where the indenture refers to both the company and its subsidiaries. Our clause, the clause at issue, the successor obligor provision, refers only to the property of the company. Other provisions of the indenture, including Section 3.1, including a provision in Article XIV governing assignments, specifically capture behavior of the subsidiary. Hildy does argue you've got to also look at the word property. Your Honor, Hildy Even if company is limited to Bannister, why doesn't property include substantially all of the subsidiary's assets? Your Honor That's to me, that's not a frivolous argument. Hildy does argue It may be one that should be answered on the plain language, certainly an issue of law, because it's the meaning of the contract. Correct, Your Honor. This court and many other courts have noted that when contracts use plain and unambiguous language, that language should be given its ordinary meaning. It should be construed according to its ordinary meaning. It's under Missouri law, counsel. You want to get property under Missouri law, what governs the term property? That would be under any law, that principle of law. No, counsel, this is a contract. It doesn't exist out in the outer space. For this particular case, the question of what property means, to the extent that is a question, would be governed by New York law because the indenture contains a New York choice of law provision. Although, the point I was trying to make, Judge Benton, and I apologize for that, the principle is the same in New York law and in Missouri, that when contractual provisions are plain and unambiguous, we give them their ordinary meaning. Now, the term property, Judge Logan, is a well-understood term in the law. We know what the property of the company is, what the property of Bannister is. In this case, the property of Bannister was the shares in Union Bank. It was its ownership interest in Union Bank. Bannister's property, under any common and ordinary understanding of that term, did not include, for example, the ATM in the Union Bank branch down the road from here. That is property of Union Bank. The only property that belonged to Bannister was the shares of Union Bank. Those were not sold to Arvest Bank. Arvest Bank only transacted with Union Bank here. This was undisputedly an asset purchase agreement. And so, while Hildeen does argue that the phrase property is ambiguous, we submit that the district court properly said that no, it's not. Property has a ñ Neither have we recited a New York case on that. The reason I retreated to Missouri is Missouri often does define a simple word like property in case law. It says it's tangible, intangible, and mixed. Correct. A specific definition of property in New York law was not cited below, but that definition is an appropriate one, the one that you've just cited, although we don't have ñ there are no cases in the record defining property under New York law. I was trying to be cute. I understand. We'll look at New York law. But the reason that's not really argued below is because ñ There's New York law on everything. There is. That is true. Trial court's reported. I've been immersed in it the last couple weeks. But ultimately it comes down to whether or not, as the district court concluded, are we to rewrite this contract so that it's plain terms, the property of the company, then becomes the property of the company and its subsidiary. And the district court expressly chose not to do so. It was correct not to do so. And one point, we have heard from Hildy and throughout the case that there is some purpose beyond the language, something special about indentures or successor obligor provisions. That is disputed by a number of things, including the American Bar Association's commentaries on model debentures, which are in the record and which say, when you are an issuer and you are entering into an indenture to issue securities, if you want a successor obligor provision to reach the assets of a subsidiary, you write the word subsidiary. And it provides a sample covenant, Sample Covenant 5, that uses ñ Is that in your brief? That is in our brief, Your Honor. That is the commentaries are exhibits UU and VV to our summary judgment brief. I know Missouri has not adopted those. Has New York adopted those briefing? New York has not adopted the commentaries, but Second Circuit cases have recognized that they are powerful evidence of the expectations ñ No Eighth Circuit law on that, I bet. I don't know if there is Eighth Circuit law. But this is a question under New York law. And the Bank Atlantic case, which Hildeen has been citing for years, applies New York law. That is a Delaware Chancery Court case, but it is applying New York law. And Bank Atlantic says, yes, under New York law, we look to the commentaries for evidence of what market participants would have thought. And the commentaries say, if you want to reach the assets of a subsidiary, use the word subsidiary, and that is because market participants, people with any familiarity with American jurisprudence, understand that a word company, especially here when it is highly defined, does not include the assets of a subsidiary. But I would point out to this issue of higher purpose, the district court correctly chose not to consider that because it started and ended its analysis with the plain language of the indenture. But there is a reason why successor obligor provisions would not capture the assets of a subsidiary, and it is precisely this kind of case. If this successor obligor provision included the word subsidiary, Arvest Bank would not have purchased the assets of Union Bank. The bank would have failed, the FDIC would have lost money, the depositors would have lost money, and jobs would have been lost. And so the omission Assuming a lot of other intervening events didn't happen. We have bank commissioners in both States and bank, right? You are assuming worst case scenario there? I may be assuming that, Your Honor, but we know, for example, that the FDIC made crystal clear to the parties in October of 2011 that something must happen here or this bank is going to fail. The Federal Reserve Bank of Kansas City in 2012, February 2012, said there are serious questions about Union Bank's long-term viability as a going concern. So I may be making slight assumptions, Your Honor, but they are I think you're taking the worst case, correct? I am taking the worst case, but it is a case that But you think it's a likely case? There is no one who weighed in on this matter. The regulators, the building You didn't recognize the softball question there. I didn't. And it was the likely case? The likely case, correct. The most likely case. The regulators might well have started a dissolution proceeding of some kind, which then would have made clear that the venture holders were out of there and so that a white knight could step in without all this litigation. They could have, but what our If that happens. Absolutely. Look at the S&L bailout and everything else. Absolutely, and although it is ultimately not particularly relevant to the question of whether or not there is a breach, Arvest Bank's expert, Anthony Santomero, who was a former chairman of the Philadelphia Fed at page 1467 of the appendix, talked about this. The FDIC prefers asset purchase agreements if they can happen. About 90 percent of bank failure cases, the FDIC tries to get an asset purchase agreement because it is the best thing for the entities it's regulating and, again, perhaps making an assumption, it's the best thing for our economy. And so the reason, one reason, the successor obligor provision may not have included the word subsidiary is precisely to allow this transaction to happen because it would not have otherwise. And so, ultimately, to find for Hildeen would require a rewriting of the contract and the district court correctly chose not to do that. It should be affirmed on that basis. If I may, just on the question of improper means, two points. We submitted a 28-J letter. And, again, to reiterate, these are three separate and independent bases for summary judgment. These were clearly not dicta. The district court granted summary judgment on three separate and independent bases. But we submitted a 28-J letter to this court last week. In December of last year, 2017, this court issued an opinion intention envelope, which made clear that if a party has an economic interest, then it can only be found liable for tortious interference with contract if it exercises improper means. And the tension envelope case reached that conclusion by citing to this court's opinion, which I believe Judge Loken authored, in the Others First v. BBB case, which was decided in 2016. And both of those cases make clear that an economic interest, an economic interest is a sufficient justification such that tortious interference liability can only be imposed if improper means were used. And here the district court held, at pages 14 to 15 of its opinion, that Arvaz Bank did have a legitimate economic interest in this transaction. It had a legitimate economic interest in establishing a banking presence on the Missouri side of the Kansas and Missouri border. And so it had a legitimate economic interest. And so in light of that finding, and in light of this court's opinions intention envelope and Others First, Hildy must prove and plead improper means in order to impose liability on Arvaz Bank. Now, throughout this case, there have been accusations that counsel for Arvaz Bank, not our firm, a different firm, lied to the regulators. We would invite the court, as part of its de novo review, as the district court did, to review the entirety of the transcript before the Arkansas State Bank Department, which is in pages 1785 to 1809 of the record. The specific portion from which Hildy excerpts a single sentence is at pages 1801 to 1805. The idea that somehow, first of all, the statements that counsel for Arvaz Bank made were true. There was correspondence with the trustee. But the idea that the Arkansas State Bank Department was duped or tricked is belied by the entirety of that transcript. The question that counsel for Arvaz Bank was answering was in response to a question a commissioner asked based on letters it had received from Hildy. Hildy submitted two letters to the Arkansas State Bank Department in which they laid out, just as how they have done here, how this was a sleight-of-hand transaction, it was unfair to the trups holders, it must not go through. The Arkansas State Bank Department had the total mix of information it needed. And so there was no misrepresentation and it was not material in any event. Arvaz Bank appreciates the court's consideration. Thank you. Thank you. First, the parade of horribles is that the bank would have gone out, people would have lost jobs. The fact is that, for example, they could have filed for bankruptcy. They could have had an auction. Just a year later, there was a bank, Rogers Bank Shares, where Arvaz actually participated in a bankruptcy auction and the trups holders got par. And so this isn't just an either-or. They saw a very valuable asset, something that was going to cost them $15 million maybe, take a decade to build up, and they came in, they used their very strong bargaining power to come in here, they induced people with stay bonuses, other compensation to come over, and the indenture itself they realized was a big problem and they tried to find a way around it. And when they went to the regulators, I invite you to read it because they've come up with a completely nonsensical explanation of what they meant during the course of that. They didn't come in and say, that was a mistake in the transcript or something else. They never went to correct it. They said what they said for a reason, which was to, as Judge Smith said, it could be construed as saying that the trups administrator, the U.S. Bank, had blessed the deal and that greased the wheels for this to occur here. If there was some issue, maybe the regulators would have said, well, maybe you ought to give these guys some money. Maybe there should be consideration. Maybe further discussion here if U.S. Bank isn't agreeing to it. But that never happened. They were led to believe it was all signed off on by the administrator and they moved on. In the case law, the detention case that was cited last week, and we filed a response letter, but the issue of the economic interest, that was not an argument that Tension argued in that case. They only argued improper means in that case. And this Court said there were no improper means because the people who were involved in the meetings, third parties, said nothing derogatory was said. So that case doesn't apply here. Others first probably did talk about it. I'm sorry? Others first probably did talk about it without justification because I know I've written on the subject. I can't remember the case. But I would point, Your Honors, to the recent Missouri case, the railroad switching case. Because Missouri law isn't clear, and even Arvist in his brief said that Missouri law is a little bit unclear on this particular point. And the rail switching case said you have to take a look between existing contracts and business expectancies. And with existing contracts, improper means are not required in those instances. And that's just from a few months ago. And my time is up. So it's extensively briefed, and I thank the panel for its consideration and ask that the case be reinstated. Well, you've put a lot on our plates, and it's been well-briefed and argued, and in a complex situation, we'll take it under advisement. Thank you, Your Honor.